IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MAC RAY MacFARLANE, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 3:13-cv-828 |
| ) | |
| BRUCE WESTBROOKS, Warden, ) | Judge Sharp |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION

Petitioner Mac Ray MacFarlane, a prisoner in state custody who is currently incarcerated at the DeBerry Special Needs Facility, has filed a *pro se* petition under 28 U.S.C. § 2254 for a writ of habeas corpus (ECF No. 1). The respondent has filed an answer in opposition to the petition, along with a complete copy of the underlying state-court record. The petition is ripe for review and this court has jurisdiction. 28 U.S.C. § 2241(d). For the reasons set forth herein, the petition will be denied.

**I.      PROCEDURAL BACKGROUND**

On January 20, 2010, the petitioner was found guilty by a Rutherford County Jury of first-degree murder, and the lesser included offense of second degree murder, for the 1982 murder of Gene Stump. The trial court merged the convictions into one conviction for first-degree murder and entered judgment on January 22, 2010; he sentenced MacFarlane (under the name Randy Ray McFarlin, a/k/a Mac Ray MacFarlane) to life in prison under the law in effect at the time the murder was committed. (ECF No. 14-1, at 65, 66 (Judgments).) The petitioner's motion for a new trial was denied (ECF No. 14-1, at 99–101), and his conviction and sentence were affirmed. *State v. McFarlin*, No. M2010-00853-CCA-R3-CD, 2012 WL 76902 (Tenn. Ct. Crim. App. Jan. 9, 2012),[1] *perm. to appeal denied* (Tenn. May 21, 2012). On September 29, 2012, the petitioner filed a *pro se* petition in the state court for post-conviction relief. (ECF No. 14-15, at 1.) Counsel was appointed but chose not to file an amended petition. (*See* ECF No. 14-15, at 13 (Notice).) After conducting a hearing, the trial entered an order denying the petition on July 23, 2013.

---

[1] The Tennessee Court of Criminal Appeals spelled "MacFarlane" incorrectly (as "McFarlane") in both the case caption and in the introductory section of its opinion.

(ECF No. 14-15, at 14–18.) The petitioner, through his attorney, filed a notice of appeal on August 20, 2013. On September 2, 2013, the petitioner, through counsel, filed a "Notice to Strike Notice of Appeal." (ECF No. 14-15, at 21.) The Tennessee Court of Criminal Appeals entered an order giving notice that it would construe the notice as a request to voluntarily dismiss the appeal, but would defer ruling on the request because it did not comply with that court's Rule 11, which requires a signed statement by the appellant indicating that he has been advised of his rights and that he expressly waives said rights. (ECF No. 14-15, at 22.) The order, dated September 6, 2013, gave counsel 30 days from the date of the order to obtain a signed waiver from the petitioner, but no such waiver was included in the record provided to this Court. The respondent submits that, to his knowledge, no response to the order had been filed by the date the respondent filed his answer on October 22, 2013. (ECF No. 15, at 4.)

MacFarlane filed his *pro se* § 2254 petition in this Court on August 16, 2013 (*see* ECF No. 1, at 10 (prisoner's oath, stating the date he placed the petition in the prison mailing system)), even before filing the notice of appeal of the state court's denial of his application for post-conviction relief. After being granted an extension of time for doing so, the respondent filed an answer to the petition (ECF No. 15) along with a copy of the underlying record. The respondent notes that the transcript of the post-conviction hearing conducted on July 17, 2013 has not yet been prepared. The record also does not include any post-conviction appellate briefs, possibly because none were submitted.

Although the petitioner's state proceedings are still pending, the respondent concedes that the petitioner's claims in this Court are technically exhausted.

## II.    STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals summarized the testimony presented at trial as follows:[2]

> On April 28, 1982, two fishermen discovered a partially decomposed body near the edge of Percy Priest Lake on an area of "very remote and not easily accessible" Army Corps of Engineers' property located in Rutherford County. La Vergne Police Department officers referred the investigation to the Rutherford County Sheriff's Office (RCSO). Then-

---

[2] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

RCSO Detective David Grisham arrived at the scene to find "a cadaver that had apparently been out there for quite a while." He described the body as "[a]ctually only half of a cadaver" because it was "intact" only from the waist down; "a lot of [the upper body] was missing" as only a rib cage, spinal column, and shoulder bones remained. Although the investigators found no skull, they did locate skull fragments and matted hair near the body. Authorities transported the body to the Middle Tennessee Hospital morgue for a coroner's examination, where they noted the presence of scars on the right knee.

Detective Grisham checked the body for a wallet or identification and found neither. The body was clothed in only jeans and clean socks, and the investigators found no shoes at the scene. They did recover, however, a portion of a shirt collar and a list of names and telephone numbers in a pocket of the jeans. The investigators also collected an empty Miller beer bottle, a Winston cigarette pack, and a lighter near the body. The lighter contained the inscription "GENE."

Rutherford County Deputy Coroner Michael Cawthorn arrived at the scene and observed a body in the "advanced stages of decomposition." He "guesstimated that [the body] was approximately four to six weeks old." From the collected skull fragments, he was able to piece together a portion of the skull and discovered a bullet hole in the front of the skull. Also a firearms instructor, Mr. Cawthorn opined that the hole "could have been made from anything from a shotgun pellet up to as much as a .38, .357, [or] maybe even possibly a .41 caliber" bullet.

On May 2, 1982, Detective Grisham contacted Doctor William Bass, a forensic anthropologist with the University of Tennessee, to assist in the identification of the body. Doctor Bass and his assistants traveled to the scene several days later where they observed "quite a bit of scatter" due to animal activity that had occurred around the corpse. He observed that not all of the skull fragments could be recovered and were probably eaten by scavengers. Nevertheless, he and his assistants located several additional bones from which they were able to piece together a large portion of the skull. From this reconstructed skull, Doctor Bass determined that the victim died from a "major wound to the skull." He opined that the victim suffered a "gunshot wound from the back and . . . upper left" that created an exit wound above the right eye. He was unable to recreate the entrance wound because not enough pieces of the skull were found. He did, however, find two skull fragments that could not be connected to any other found fragments. He determined that the skull had been shattered at the entrance wound and that a shotgun was the likely weapon. He further opined that as pellets from the shotgun shell scattered throughout the victim's brain, one or more of the pellets created the exit wound.

RCSO Chief Deputy Asbury, a detective in 1982, collected evidence at the crime scene as well. Through the list of telephone numbers, the cigarette lighter inscribed with the name "Gene," and the scars on the victim's leg, investigators determined the victim to be Errastus "Gene" Stump. Although there were initially "an infinite number" of suspects in the victim's death, ultimately their investigation revealed that the defendant had the only motive to kill the victim.

Then-RCSO Deputy Steve Pickel also collected evidence at the scene. He retrieved a beer bottle, clothing scraps, a cigarette pack, shotgun wadding, and a list of telephone numbers. By calling the telephone numbers, the investigators contacted a friend of the victim who was able to identify the victim's body.

On April 29, Deputy Pickel also contacted the defendant, who was one of the victim's friends and co-workers. The defendant told Deputy Pickel that he had last seen the victim on March 29 at the defendant's home. He told Deputy Pickel that the victim arrived at his home with some people in a van and that the victim told the defendant that

he was leaving with the people to go to Ohio. The defendant said that he loaned the victim $200 and gave him a couple of beers. The defendant claimed that the victim also asked the defendant to take the victim's car and last paycheck to the victim's ex-wife. The defendant called a mutual friend to help him deliver the car to the victim's ex-wife. The defendant claimed that the victim asked him to keep his guns for him. He told Deputy Pickel that he never heard from the victim again.

On May 3, Deputy Pickel spoke to the defendant again. Once more, the defendant told Deputy Pickel that the victim left in a van with some people who were going to Ohio. The defendant also told Deputy Pickel that he was familiar with the area where the victim's body was found and that it was a place where people frequently shot targets. The defendant admitted that he helped the victim prepare his income tax return and that when the tax refund check arrived, the defendant endorsed it and deposited it into his personal account for money the victim owed him. The defendant claimed that he had socialized a lot with the victim in the past but that he "had not been running around with [the victim] as much" in the months leading up to the victim's death. In a May 11 statement, the defendant admitted that he and the victim had recently robbed a Kwik Sak market in Smyrna. The defendant later pleaded guilty to that offense.

During the course of the investigation in 1982, the defendant never admitted killing the victim. Deputy Pickel considered the defendant "no more a suspect than some other people." No arrests were made for the victim's murder, and the case remained unsolved for over 20 years.

RSCO Chief Deputy Virgil Gammon assisted in the investigation at the scene in April 1982 when still working as a detective and recalled the items collected on and near the body. Sometime in the 1990s, a sewage flood at the jail rendered most of the evidence collected at the scene unsalvageable, and most of the items were discarded. When investigators re-opened the case in 2007, they located only the victim's reconstructed skull and the hair mass.

Detective Dan Goodwin worked with the RCSO's cold case unit, which was created in 2007. Detective Goodwin interviewed several of the victim's and defendant's coworkers who had never been interviewed during the 1982 investigation. He also learned that the defendant had been married three times in the years since the victim's death. He interviewed each of the defendant's ex-wives: Donna Burroughs, his wife at the time of the victim's death; Joyce Dannette Mallard, his wife for a brief period of time in 1992; and Ellen Marie Buckman, his wife of over 12 years until their divorce in 2006. Through his investigation, Detective Goodwin learned that the defendant had made inculpatory admissions to each of his wives. Ms. Burroughs admitted making a false statement to the investigators during the 1982 investigation because she was "coached" by the defendant. In the ensuing years, the defendant had also legally changed his name twice—to Randy Ray MacFarlane and then to Mack Ray MacFarlane.

In April 2008, Detective Goodwin interviewed the defendant at his place of employment in Bristol, Tennessee. The defendant admitted his participation in the Kwik Sak robbery, yet he denied that he spent much time with the victim from the time of the victim's divorce in November 1980 until his death in March 1982. The defendant also denied any knowledge of the crime scene or circumstances of the victim's death, contrary to his 1982 statements. For the first time, the defendant reported that the victim had been seeing James Hirlston's wife; the Hirlstons were mutual friends of the defendant and victim. Significantly, the defendant did not claim that the victim left town with some people to go to Ohio as he had reported in 1982. Detective Goodwin's investigation revealed that the defendant had stolen the victim's wallet, money, and cowboy boots. Based upon the discrepancies between the 2008 statement and previous statements, Detective Goodwin arrested the defendant for the victim's murder and robbery.

In May 2009, Steve Scott, a firearms expert with the Tennessee Bureau of Investigation (TBI), analyzed the hair mass recovered near the victim's body and located several lead particles and bone fragments within the hair. He found what appeared to be shotgun wadding, but his testing could not conclusively determine it to be so. Special Agent Scott did, however, locate buffer material from a shotgun shell within the hair mass and forwarded it to the TBI microanalysis unit for further testing and comparison to shotgun shells produced in the 1980s.

In June 2009, TBI Special Agent Randall Kirk Nelson analyzed particles recovered from the hair mass by Special Agent Scott. He compared the particles to buffer material from both Remington and Federal 12 gauge shotgun shells and determined that the particles were "consistent with buffer material . . . [of] the Remington 12 gauge shotgun cartridge."

In August 2009, Doctor Sandra Thomas, a forensic pathologist with the Tennessee Medical Examiner's Office, performed an autopsy on the exhumed remains of the body. She noted the "skeletalization of the body" at that time. She also noted the well-preserved lower extremities of the body from which she observed no other apparent injuries that may have contributed to the victim's death. Doctor Thomas reviewed Doctor Bass's report and concluded that her autopsy revealed nothing inconsistent with his conclusion that the victim died of a gunshot wound to the head. She further agreed that the severe fragmentation or absence of the back of the skull was consistent with the victim's suffering a shotgun blast to the back of the head. Doctor Thomas removed a portion of the victim's femur bone and forwarded it to Orchid Cellmark, a private deoxyribonucleic acid (DNA) testing laboratory, for DNA testing.

Romy Franco, a forensic DNA analyst with Orchid Cellmark, performed mitochondrial DNA testing on cells extracted from the victim's femur bone. Through comparison with an oral swab DNA sample of the victim's brother, Steve Stump, Ms. Franco determined that the femur "most likely" came from Gene Stump. Deanna Lankford, another forensic DNA analyst with Orchid Cellmark, performed a parentage DNA analysis of the cells from the femur by comparing them with an oral swab DNA sample from the victim's son, Jason Stump. Ms. Lankford determined within a 99.9 percent certainty that the femur came from the victim. Additional testing of the bone fragments recovered at the scene revealed a positive match with cells extracted from the femur.

At the defendant's January 2010 trial, Steve Stump testified that the victim moved from West Virginia to Tennessee in 1977 in search of employment. . . .

Mary Stump Godfrey met the victim in West Virginia in 1975 and later moved to Murfreesboro, Tennessee with him, where they soon married. The couple had a son together, Jason, and the victim also raised Ms. Godfrey's daughter, Rachel, as his own. She said that the victim was good to her two children. She also described him as hard-working and dedicated to his job at Thompson and Green Machinery, where he worked with the defendant. The couple divorced in 1980. By 1982, however, the couple was working hard to reconcile. Ms. Godfrey testified that the victim spent a lot of time "running around" with the defendant going to bars and drinking, but by 1982 he wanted to get away from the defendant "to be with the kids." Ms. Godfrey recalled that she learned of the victim's death while out of town with friends. She said the victim typically carried a wallet and that he "always had money." She said the victim always wore jeans, western shirts, and cowboy boots. She also recalled that the victim always carried a lighter inscribed with his name and that he smoked Winston cigarettes and sometimes drank Miller beer. She also said that she never reported the victim missing because it was not unusual for the victim to stay gone for days at a time after their divorce.

. . . .

James Hirlston was a close friend of the victim in 1982. . . . Mr. Hirlston said that he last saw the victim on the morning of March 29 when he picked up the victim from a motel room and took him to his car in time to go to work. He recalled the defendant's telephoning him sometime about one month before the discovery of the victim's body. The defendant asked Mr. Hirlston to come pick up the victim's car at his home and take it to the victim's ex-wife. The defendant then told Mr. Hirlston that the victim had "left in a van with a bunch of people the night before." Mr. Hirlston never understood the defendant's explanation of the victim's leaving; he testified, "[I]t didn't make sense to me. There's too many friends and [a] good job and all that. Why would [the victim] just walk off on all of it?"

Stephen Burns worked at Thompson and Green Machinery with both the victim and the defendant. He described the victim as a "good worker" who always showed up for work and often worked overtime. He said that the victim's not showing up for work in March and April 1982 was "very unusual." He found it "extremely hard to believe" that the victim "got into a van with a bunch of hippies," as was reported by the defendant. Mr. Burns also recalled that the victim and the defendant "got along real well." He said, however, that their friendship "seemed to be strained" immediately before the victim's disappearance.

. . . .

Charles Head also worked at Thompson and Green Machinery with the victim and the defendant. He recalled that the victim never missed work unless he was "deathly sick," in which case he would always call in. He was concerned when the otherwise "very dependable" victim failed to report to work for such an extended time. He also thought it "very unusual" for the victim to leave town "with a bunch of hippies."

Billy Joe Smith described the victim as "one of the best friends [he] ever had." He said that he and the victim were roommates after the victim's divorce. Once when he was visiting his sister-in-law, Evelyn Smith, the police responded to a domestic violence report at Ms. Smith's home. When the police arrived, "[n]othing was going on." Several weeks later, the victim told Mr. Smith that the victim and the defendant had called the police to divert the police while they robbed a Kwik Sak. As the defendant overheard this conversation, he told the victim, "'You keep running your mouth, Stump. It could get you killed.'"

Evelyn Smith was married to Mr. Smith's brother, Walter, who died in May 2009. She met the victim in 1980 through the victim's wife, Mary. Ms. Smith described the victim as "a perfect fellow. Real nice and gentle. Real sweet. I mean he'd do anything for you." She said during the 1980s, the men would often all go out drinking together. She remembered that the police responded to a false domestic violence report and that the victim later admitted that he and the defendant had called it in to divert the police while they robbed a Kwik Sak. Ms. Smith said the defendant became angry with the victim's "running his mouth" and warned him to "shut-up" or "that's gonna get your ass killed." She recalled the victim's wanting to move back to West Virginia, but she said that he never would have left town without telling his son goodbye.

Charles Bickett knew the defendant as Mack Ray McFarlane when they met in the late 1990s in Kentucky. He said that once when he was out riding around with the defendant, the defendant admitted that he had shot a man in the woods with either a shotgun or a rifle 15 or 20 years before. Mr. Bickett did not really believe the defendant, whom he described as being "in a crying mood . . . sort of snotting around" when the admission was made.

William Sapp met the defendant as Mack MacFarlane in 2000 or 2001 while living in Kentucky. He testified that the defendant told him that he "took his friend rabbit hunting down by a river or a creek and that he [ ] killed him and made it look like an accident." The defendant told Mr. Sapp that he "thought the guy was going to testify against him," so "he wanted to take care of him." When asked why he did not report the defendant's confession to the police, he explained, "I didn't really think about calling the police. [I d]idn't know if he did it. [I d]idn't know if he hadn't done it. . . . [I] just know what he told me."

Joyce Dannette Mallard, the defendant's second wife, married the defendant in November 1992 and divorced him in 1993. She recalled the defendant's telling her that "he had murdered somebody and got away with it." Several times during their brief marriage, the defendant told Ms. Mallard, "'I've killed somebody before. I shot him.'" After the couple divorced, they still worked at the same factory. Ms. Mallard said the defendant would stop by her work station and threaten her and her children's safety by saying "'[y]ou know what I told you. You better never tell nobody because I will do what I said I will do.'" Ms. Mallard did not disclose the defendant's admissions until detectives contacted her in 2008. She explained that she was scared of the defendant throughout their marriage because the defendant hurt her "[a]ll the time."

Ellen Buckman, the defendant's third wife, married the defendant in December 1995 and divorced him in June 2006. She recalled that the defendant changed his name twice during their marriage and that he had a tattoo, "Donna"—the name of his first wife, on his arm. Before they were married, the defendant told Ms. Buckman "something horrible" about his past. She recalled that while telling her, the defendant "hung his head" and admitted he "shot that man and left him there to die." She said the defendant was "very emotional," "weepy," and "remorseful" as they spoke. The defendant told her that he killed the man because they had committed a robbery together and the man was planning on turning himself in. Ms. Buckman recalled that the defendant described the wooded scene where the shooting occurred in great detail. The defendant also disclosed that he returned to the scene several weeks after the killing and that the victim had been "torn up pretty badly by animals." The defendant then took the boots from the victim's body because he believed that the boots were the only way to identify the victim.

Ms. Buckman said that the defendant talked about the killing over 200 times throughout their marriage. She also said that the defendant was "unusually captivated" by the movie, *Miller's Crossing*, and would watch it repeatedly. She said that, during one particular scene, the defendant told her, " ' That's what it felt like whenever I took Gene to the woods to kill him.' " Ms. Buckman related the defendant's account of the shooting:

> He told me that when he parked they got out of the truck. He let Gene take the lead. And they were walking through the woods. As they got closer, nearer to the body of water, after he felt like they had gone far enough, that they were in a good spot, that's when he decided to shoot him.

The defendant told Ms. Buckman that he shot the victim with a shotgun between his shoulder blades and then "he turned and he left that man there to die." Two video clips from Miller's Crossing were played for the jury: one showed a wooded area and pathway that was similar in appearance to the area where the victim's body was discovered; another clip portrayed the characters walking through the woods with one man begging the other man not to kill him. The trial court instructed the jury that the video clips were not shown as a re-enactment of the killing but that they could be considered for the effect they had on the defendant relative to his admissions to Ms. Buckman.

Ms. Buckman did not feel safe to contact the police until she left the defendant in June 2006 and returned to her family in Kentucky. She contacted the police within three

days of leaving the defendant. She did, however, talk to her priest about the defendant's admissions prior to going to the police. She testified that she had been traumatized by the defendant throughout their marriage and remained scared of him.

Donna Burroughs, the defendant's first wife, married the defendant in 1978 when she was 18 years old. The couple divorced in 1992. Ms. Burroughs remembered the defendant's friendship with the victim and said that the two men "spent many hours out together" drinking at bars—"all that Urban Cowboy thing." She said that the last time she saw the victim, the defendant invited the victim to "sight his gun" with him. The victim came to their home, and then he and the defendant left together; the defendant carried a "long gun" as they left. The defendant returned home later that night "very excited . . . almost giddy." The next morning, when Ms. Burroughs saw the victim's car at their home and inquired about it, the defendant told her that the victim had left town and had instructed the defendant to give the car to his ex-wife. Ms. Burroughs recalled the defendant's saying that the victim "left in a van with some hippies." Some time after that, she remembered the defendant's taking the victim's tax refund check. She said that after the victim's disappearance, her marriage improved because the defendant stayed home more.

When the victim's body was found, the detectives questioned Ms. Burroughs. The defendant instructed Ms. Burroughs to tell the detectives that the victim came by their home to borrow some money but that she did not see the victim. He further instructed her to tell the detectives that the defendant came to her in the back of the house to get $200 for the victim, and then the victim was on his way. The defendant warned Ms. Burroughs not to mention anything about the men going out to "sight" the gun on the last night the victim was seen. The defendant admitted participating in the robbery of a Kwik Sak and was arrested.

Ms. Burroughs testified that the defendant mentioned the victim's death several times over the course of their marriage. Once, the defendant came home "really wasted" and went out on the front porch in his underwear. When Ms. Burroughs tried to usher the defendant inside, he yelled at her, "Do you want to be buried at the lake with Stump?" On another occasion, while out to dinner at Red Lobster, the defendant admitted killing the victim to get the victim's job at Thompson and Green Machinery. On other occasions, the defendant admitted shooting the victim in the back of the head and taking his boots.

Ms. Burroughs said that she never told anyone about the defendant's admissions until the detectives contacted her in 2008. When asked why she did not report the defendant, she said,

> The most important thing to me was that I raise my kids. And I know I would have been in danger. And my children mean everything to me. And I knew the best upbringing they could have was for me to be their mother and to be alive and well.

She also said that during her marriage to the defendant, she did not want to believe that he could do such a thing. She admitted that her 1982 statement to detectives was entirely a lie, but she explained that the defendant had abused her throughout their marriage. She reiterated that her "first and foremost goal" at the time was "getting [her] children to adulthood."

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161–62 (Tenn. 1999), the defendant elected not to testify.

The defendant presented the testimony of RCSO Detective Charles Barnes, who

testified regarding the loss of physical evidence in the case. Detective Barnes noted that although many of the items collected at the scene were lost, no testing had been performed on the items because both the body and the evidence had lain in the woods for over a month before discovery and also because DNA testing was not available in 1982. He opined that any testing would have been of no consequence.

*State v. McFarlin*, 2012 WL 76902, at *1–8.

### III. ISSUES PRESENTED FOR REVIEW

In his present petition, MacFarlane asserts the following claims for relief:

1. That the trial court erred in allowing the prosecution to play a "Hollywood movie clip" during trial (ECF No. 1, at 5);

2. That the state failed to preserve relevant evidence; and

3. That the evidence was insufficient to support the conviction.

### IV. STANDARD OF REVIEW

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once a petitioner's federal claims have been raised in the highest state court available,[3] the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

---

[3] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

A habeas petitioner bears the burden of demonstrating that he properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by statutes of limitations or state rules barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional error, or alternatively that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *cf. Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

Even when a petitioner's application for a writ of habeas corpus raises only federal constitutional claims that have been properly exhausted in the state courts, this Court's review of the state court's resolution of those issues remains quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> 
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> 
> (2) resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding.

*Id.* In other words, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Additionally, this Court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (citation omitted).

With respect to the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> . . . . [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409–11 (emphasis original).

With these principles in mind, the court will turn to the examination of the claims raised in MacFarlane's petition for habeas relief.

## V. ANALYSIS AND DISCUSSION

### A. Ground One: The trial court erred in allowing the jury to view a movie clip.

The petitioner contends that the trial court erred in permitting the state to introduce into evidence, based on testimony presented by the petitioner's ex-wife, Ellen Buckman, two scenes from the movie *Miller's Crossing*. He asserts that the movie excerpts, besides having no probative value, were designed to inflame the jury's emotions and were unduly prejudicial. He argues that the trial court abused its discretion in allowing the scenes to be introduced into evidence, and that the Tennessee Court of Criminal Appeals erred in finding that any error in admitting the scenes into evidence was harmless.

The petitioner raised an identical claim in his direct appeal, where he argued that the prejudicial effect of the movie clips far outweighed any possible probative value, and therefore should have been excluded under Rule 403 of the Tennessee Rules of Evidence. (ECF No. 14-14, at 22.) There as here, the petitioner's argument is premised solely on an alleged violation of Tennessee law.[4] Relief may be available under § 2254 only if the petitioner establishes that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012). Quite simply, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Because the petitioner does not allege a violation of federal law, he fails to state a claim for which relief may be granted under § 2254. *See Estelle*, 502 U.S. at 67 ("[F]ederal habeas corpus relief does not lie for errors of state law." (citation omitted)).

In his answer, the respondent nonetheless acknowledges that an evidentiary error may be "so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) (citing *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)). The respondent argues, however, that even if the present petition can be construed to state a federal claim based on the admission of the evidence in question, such a claim is procedurally defaulted by the petitioner's failure to

---

[4] The petitioner also raised this claim in his state post-conviction petition (*see* ECF No. 14-15, at 8–9.) The post-conviction court did not address the issue, however, because the petitioner conceded that it was decided on direct appeal. (ECF No. 14-15, at 16.)

present the federal claim to the state courts.

Although the petitioner's post-conviction appeal is still pending before the Tennessee Court of Criminal Appeals, it is clear that this evidentiary issue, if construed as a federal due-process claim, was defaulted in the state courts, because the petitioner did not raise the issue as a federal constitutional claim in his direct appeal. He did not raise the claim as a federal issue in his post-conviction petition either; even if he had, or if he tried now to raise it in his post-conviction appellate brief (if he ever files such a brief), it would be deemed waived under Tennessee law based on his failure to raise the issue on direct appeal. *See* Tenn. Code Ann. § 40-30-106(g) (a ground raised in post-conviction is deemed waived if it could have been but was not raised on direct appeal).[5] Because the issue was waived, the petitioner no longer has the ability to raise the claim in his state proceedings. The claim is therefore technically exhausted but procedurally defaulted.

As set forth above, a claim that is considered exhausted (because no further state review is available) but procedurally defaulted (because it was never presented to the state courts), may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, to obtain consideration of a defaulted claim, the petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional error, or alternatively that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The petitioner has not presented any basis for overcoming the procedural default.

In sum, the Court finds that the petitioner is not entitled to relief on the basis of the claim presented in ground one, because it is premised solely upon an alleged violation of state law. Further, the petitioner is not entitled to relief on this ground even if it could be construed to state a claim for relief on the basis of a violation of federal constitutional law, because such claim is procedurally defaulted, and the petitioner has not presented a basis for overcoming the default.

---

[5] This rule is regularly applied by the Tennessee courts. *See, e.g.*, *Alonzo v. State*, No. M2010-00097-CCA-R3-PC, 2011 WL 3841963, at *8 (Tenn. Ct. Crim. App. Aug. 30, 2011); *McCarver v. State*, No. M2009-00753-CCA-R3-PC, 2010 WL 596344, at *4 (Tenn. Ct. Crim. App. Feb. 19, 2010); *Cormia v. State*, No. E2003-00653-CCA-R3-PC, 2005 WL 3190313, at *12 (Tenn. Ct. Crim. App. Nov. 28, 2005).

### B. Ground Two: The state failed to preserve relevant evidence.

The petitioner argues that the Rutherford County Sheriff's Department reportedly discarded a number of items found at the crime scene after they were contaminated by a sewer leak in the evidence room. These items included a beer bottle, Winston cigarette pack, note paper, cigarette lighter with the name "Gene" engraved on it; and multiple shotgun shell casings. The petitioner argues that, because the state failed to preserve this evidence, he was never provided the opportunity to have the items tested for fingerprints or DNA evidence that would have "revealed the identity of the true perpetrator of the crime." (ECF No. 1, at 31.) The petitioner maintains that the Rutherford County Sheriff's Department committed gross negligence in discarding the evidence, and that the state court erred in finding otherwise.

In his direct appeal, the petitioner argued that the indictment against him should be dismissed because the state's loss of much of the physical evidence found at the crime scene made the trial fundamentally unfair. In making this argument, the petitioner referenced the federal standard governing the state's duty to preserve evidence as articulated by the Supreme Court in *Arizona v. Youngblood*, 488 U.S. 51 (1988). The petitioner noted that, under *Youngblood*, the state's failure to preserve useful evidence does not constitute a denial of due process of law unless the defendant can show that the police acted in bad faith. (ECF No. 14-14, at 19–20 (citing *Youngblood*, 488 U.S. at 57–58).) The petitioner, however, did not argue that there was any evidence of bad faith in the state's failure to preserve evidence in his case.[6] Instead, he argued that the Tennessee Supreme Court, in *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), had declined to follow *Youngblood* and instead applied a more stringent test under the Tennessee Constitution.

In *Ferguson*, the Tennessee Supreme Court noted that, although it had previously construed the Tennessee Constitution's protection of due process to be co-extensive with the protection provided by the United States Constitution, it had also "recognized that [the Tennessee Supreme Court], as the final arbiter of the Tennessee Constitution, is always free to expand the minimum level of protection mandated by the federal constitution." *Ferguson*, 2 S.W.3d at 916 (quoting *Buford v. State*, 845 S.W.2d 204, 207

---

[6] In fact, the evidence showed that sometime in the 1990s, jail inmates caused a sewage flood of the evidence room, which rendered most of the evidence collected at the scene unsalvageable, and most of the items were discarded. When investigators re-opened the case in 2007, they located only the victim's reconstructed skull and the hair mass. *McFarlin*, 2012 WL 72902, at *2, *10.

(Tenn. 1992)). Consistent with that liberty, the Tennessee Supreme Court rejected *Youngblood*'s bad-faith test and adopted instead a balancing test that requires, first, a determination of whether the state had a duty to preserve the evidence in question, and if so, next requires consideration of a number of factors to determine whether the state breached that duty, including the degree of negligence involved, the significance of the evidence that was lost or destroyed, and the sufficiency of the other evidence used at trial to support the conviction. *Id.* at 917.

The Tennessee Court of Criminal Appeals applied the *Ferguson* test in MacFarlane's case, and concluded that the loss of evidence at issue was not attributable to gross negligence on the part of the state, that any testing of the lost evidence would likely not have produced exculpatory results, that the defendant had confessed to the murder numerous times to various individuals over the years, and that the trial court had not erred in concluding that the loss of the some of the physical evidence did not render the trial fundamentally unfair. *McFarlin*, 2012 WL 76902, at *10.

In other words, the Tennessee court analyzed the petitioner's Fourteenth Amendment claim under a standard that is more protective of the rights of the accused than the *Youngblood* standard. The state court's conclusion that the destruction of the evidence was not the result of gross negligence was a reasonable determination based upon the facts presented at the pretrial hearing. If the destruction of the evidence was not the result of gross negligence, it certainly cannot be said that the officers were acting in bad faith, such as would be required for a successful claim under *Youngblood*. The Tennessee court's determination is not contrary to, nor an unreasonable application of, clearly established federal law as established by the United States Supreme Court. The petitioner is not entitled to relief on the basis of this claim.

  **C.**  **Ground Three: The evidence was insufficient to support the conviction.**

On direct appeal, the petitioner argued that the only evidence linking him to the murder was the alleged confessions he made to different people over the years, and that these confessions alone, under Tennessee law, were not sufficient to establish his conviction. (ECF No. 14-14, at 27–28 (citing *Ashby v. State*, 139 S.W.972, 875 (Tenn. 1911)).) Although the argument was not expressly framed as a federal constitutional claim, the Tennessee Court of Criminal Appeals analyzed the claim under both Tennessee

law regarding the establishment of "*corpus delicti*" and the standard established by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). The court reasoned as follows:

> We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).
>
> When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*
>
> To be sure "a conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the *corpus delicti*." *See State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). The *corpus delicti* consists of two elements: (1) a certain result has been produced, and (2) some person is criminally responsible for the act. *See State v. Shepherd*, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). The State needs "only slight evidence of the *corpus delicti* . . . to corroborate a confession and sustain a conviction." *Smith*, 24 S.W.3d at 281. Furthermore, when a defendant confesses to a crime, the corroborating evidence "'need not be as convincing as the evidence necessary to establish a *corpus delicti* in the absence of any confession.'" *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006) (quoting *Ricketts v. State*, 241 S.W.2d 604, 606 (Tenn. 1951)). "Whether the [S]tate has sufficiently established the *corpus delicti* is primarily a jury question." *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). All elements of the *corpus delicti* may be established by circumstantial evidence. *State v. Garmon*, 972 S.W.2d 706, 708 (Tenn. Crim. App. 1998).
>
> In 1982, Tennessee Code Annotated section 39-2402(a) provided that "[e]very murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree."
>
> . . . .
>
> The claim that corroboration of the defendant's confessions was required relates only to the State's obligation to establish the *corpus delicti*—"the body of the crime [or] evidence that a crime was committed at the place alleged in the indictment." *See Smith*, 24 S.W.3d at 281. The commission of a homicide was amply established by physical and expert evidence that the victim, whose body was found, had been shot in the head with a shotgun.
>
> With the *corpus delicti* sufficiently established via corroboration, we do not believe that the defendant's confessions need to be otherwise corroborated. The defendant's multiple confessions established his culpability for the victim's death. At any rate, Evelyn and Billy Joe Smith both testified additionally that the defendant threatened the victim that his bragging about the Kwik Sak robbery "would get [the victim] killed." Ms.

> Burroughs testified concerning the last time she saw the victim alive at her home on the evening of March 29, 1982, and the victim's leaving with the defendant to go "sight" the defendant's "long gun." She also testified to the defendant's demeanor when he arrived home and his telling Ms. Burroughs that the victim would not be coming back. Details gathered from the scene concerning the victim's missing boots, location of the body, and condition of the body further established the defendant's culpability when compared to his statements concerning the same. Accordingly, we conclude that the evidence is sufficient to support the defendant's conviction of first degree premeditated murder and of second degree murder as a lesser included offense of first degree felony murder.

*McFarlin*, 2012 WL 76902, at *11–12.

The Tennessee court's conclusion that the evidence was sufficient to support the conviction was a reasonable determination based upon the facts presented at the trial, and the legal standards applied were not contrary to or an unreasonable application of clearly established federal law.

However, although MacFarlane's habeas petition appears to incorporate the sufficiency-of-the-evidence argument presented to the state courts, he also incorporates into this ground for relief an entirely novel claim that was not presented to the state courts. MacFarlane argues that the evidence presented at trial was insufficient to convict him because the testimony given by the five witnesses to whom he had allegedly confessed was false, and because, he claims, the witnesses were "coached by the detectives assigned to the case." (ECF No. 1, at 12.) The doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998)). The claims in a federal habeas petition cannot rest on a theory that is "separate and distinct from the one previously considered and rejected in state court." *Id.* Moreover, if the petitioner tried to raise the argument before the state courts now, it would be deemed waived. *See* Tenn. Code Ann. § 40-30-106(g) (a ground raised in post-conviction is deemed waived if it could have been but was not raised on direct appeal). The claim is therefore technically exhausted but procedurally defaulted.

As discussed above, a claim that is considered exhausted (because no further state review is available) but procedurally defaulted (because it was never presented to the state courts), may not be considered by the federal court on habeas review except under extraordinary circumstances, *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted), but the petitioner has not acknowledged that his claim is defaulted or presented any argument for overcoming the procedural default.

The petitioner is not entitled to relief on the basis of this claim, whether the Court construes the

petitioner to be asserting that the state court erred in its resolution of the claim as presented to that court, or if it is construed as an entirely novel claim.

## VI.     CONCLUSION

For the reasons set forth herein, MacFarlane's petition under § 2254 will be denied and this matter dismissed with prejudice. An appropriate order is filed herewith.

_Kevin H. Sharp_
Kevin H. Sharp
United States District Judge